Office Communications Company, Inc. v. Commiissioner.
Office Communs. Co. v. Commiissioner
Docket No. 2768-70. United States Tax Court
T.C. Memo 1972-14; 1972 Tax Ct. Memo LEXIS 243; 31 T.C.M. (CCH) 33; January 17, 1972, Filed *243 Business expenses: Officer's compensation: Reasonableness: Attorneys Fees: Allocation. - 1. Petitioner was in the telephone answering service business. On the average it employed eight operators who were responsible for receiving messages and relaying them to petitioner's customers. The operators also performed a few clerical duties. Petitioner's only other employee was its president and sole shareholder, Hendrix, to whom it paid a salary of $18,000 in 1966 and 1967. Hendrix was a diligent and tireless worker for petitioner who performed all supervisory, clerical, secretarial, and accounting services which were necessary for petitioner's operation. Held: A reasonable salary for Hendrix' services in each year would have been $13,000. 2 Held: Deductions for attorneys' fees were allocated between petitioner and Hendrix. *244 Moyer P. Hendrix (president), 614 Nissen Bldg., Winston-Salem, N.C., for the petitioner. Steve C. Horowitz, for the respondent. IRWIN
Memorandum Findings of Fact and Opinion IRWIN, Judge: Respondent determined the following deficiencies in petitioner's income taxes: Year
Deficiency
1966
$1,839.08
1967
1,964.85 The deficiencies are based upon respondent's determination in each year that part of the salary paid to petitioner's president and sole shareholder was not reasonable compensation and that amounts paid as legal fees were not ordinary and necessary expenses of petitioner's business. Findings of Fact Petitioner is Office Communications Company, Inc., a corporation chartered under the law of North Carolina which had its principal place of business at all relevant times in Winston-Salem, N.C. Petitioner filed its corporate income tax return for 1966 with the district director of internal revenue, Greensboro, N.C., and for 1967 with the director, Southeast Service Center, Chamblee, Ga.
In 1966 and 1967, Moyer P. Hendrix (hereafter Hendrix) was the president and sole stockholder of petitioner. Hendrix has occupied the presidency *245 since 1950. Petitioner was engaged in the telephone answering service business in Winston-Salem. N.C. Petitioner employed on the average eight operators who provided 24-hour a day telephone answering service. The operators would reutinely receive telephone messages for petitioner's customers which were noted on a message pad and relayed back to the customer at a later time. In addition, the operators kept track of the hours that they worked and prepared a record of all daily calls which indicated the customer receiving the calls. Occasionally, the operators would perform clerical or office functions such as stuffing and stamping envelopes for billing and interviewing job applicants. Petitioner had no employees other than the operators and its president, Hendrix. In addition to being the president of petitioner, Hendrix was a certified public accountant. Hendrix, who practiced as a sole proprietor, provided general accounting services (including preparation of Federal and state tax returns) to his numerous accounting clients. Hendrix also performed all office functions with respect to his accounting practice himself. Hendrix earned fees in his accounting practice of about $17,000 *246 in both 1966 and 1967 with net profits of about $14,000 and $16,000, respectively. Hendrix also owned a farm with his brother which was located in Sparta, N.C. (about 75 miles from Winston-Salem). Hendrix' brother took care of the day-to-day management of the farm; however, Hendrix himself did contribute some accounting and clerical services to the farm operations. Hendrix was a tireless worker. He had no hobbies. He worked nights, weekends, and holidays. Accordingly, Hendrix devoted as much time to his duties as president of petitioner as would a normal full-time president without any outside businesses. Petitioner supervised the operation of the answering service, solicited customers, prepared monthly statements for customers, kept the books and records, and performed all accounting and clerical services 34 necessary to the operation of the business. When necessary, petitioner would man the switchboards in order to insure continuous service for his customers. During 1966 and 1967, Hendrix' burden of providing accounting services for petitioner was increased some-what because petitioner was under investigation for both criminal and civil tax fraud for prior years. Form *247 1959 to 1965 petitioner never paid Hendrix a salary in excess of $6,500; however, for both 1966 and 1967 it paid him $18,000. Respondent disallowed as unreasonable $11,500 of petitioner's deduction in each year for Hendrix' salary. The following table represents petitioner's financial picture during the years at issue: Gross
Operators'
Net Profit
Year
Receipts
Salaries
(or Loss)
1966
$48,434.49
$21,290.53
($8,091.61)
1967
56,600.14
25,013.63
(5,407.37)
On September 17, 1965, a joint tax investigation of petitioner and Hendrix was initiated. The law firm of Craige, Brawley, Lucas & Horton, Winston-Salem, N.C., was retained by petitioner and Hendrix to represent both of their interests. On January 6, 1966, a $6,000 retainer fee was paid to the law firm by Hendrix, who advanced the money because petitioner did not have the necessary funds. In May 1967, an additional $3,000 was paid to the law firm. For these amounts the law firm conducted an investigation and did research into the tax problems of petitioner and Hendrix. It also represented both of them at conferences with various representatives of respondent. For 1966, petitioner *248 deducted $5,000 as an expense for professional services on its corporate tax return while Hendrix deducted the remaining $1,000 paid to the attorneys as an expense on his personal income tax return. The entire $3,000 paid to the attorneys in 1967 was deducted by petitioner on that year's return. Opinion Petitioner is in the telephone answering business offering service seven days a week, 24 hours a day. On the average petitioner employs eight operators who receive calls and take messages and perform some clerical functions. Petitioner's only other employee is its president and sole stockholder, Hendrix, to whom it paid a salary of $18,000 in both 1966 and 1967. Respondent disallowed deduction of $11,500 of the salary paid in each year to Hendrix on the ground that ti represented unreasonable compensation. Respondent also disallowed deductions in the amount of $5,000 in 1966 and $3,000 in 1967 for legal services which respondent contends were not ordinary and necessary expenses of petitioner's business because they were incurred on behalf of and for the benefit of Hendrix individually. Reasonable Compensation Whether a particular salary represents reasonable compensation for *249 services that can be deducted under section 162 is a question of fact to be determined in light of all facts and circumstances. Hoffman Radio Corp. v. Commissioner, 177 F. 2d 264 (C.A. 9, 1949). However, respondent's determination of reasonableness is presumed correct and petitioner has the burden of proving that a greater salary was warranted upon the facts. Botany Mills v. United States, 278 U.S. 282 (1929); Miller Mfg. Co. v. Commissioner, 149 F. 2d 421 (C.A. 4, 1945). In this case, respondent found that only $6,500 of the $18,000 paid Hendrix each year as salary was reasonable compensation. This determination was based upon the following factors: (1) the salary that petitioner paid Hendrix in prior years (which never exceeded $6,500); (2) the operating losses that petitioner would sustain if greater salaries were allowed; (3) the unrelated business activities of Hendrix; and (4) the salaries paid to the chief executive officers of other corporations in the same line of business as petitioner. See Mayson Mfg. Co. v. Commissioner, 178 F. 2d 115 (C.A. 6, 1949). We find respondent's arguments to be persuasive only in part. While *250 salaries paid in prior years are to be considered in determining whether a current salary is reasonable, the payment of a low salary in prior years does not necessarily preclude the payment of a larger one in later years. Similarly, a particular salary may be deemed reasonable even if the business is not profitable. As we noted, all circumstances must be considered; however, a reasonable salary is generally assumed to be one which an unrelated employer would pay for the same services in similar circumstances. Hecht v. United States, 54 F. 2d 968 (Ct. Cl. 1932). Section 1.162-7(b)(3), Income Tax Regs. In essence, we are to determine what the 35 services of Hendrix would be worth on the open market. The record in this case is marked by a lack of cooperation between the parties and an extreme bitterness on the part of petitioner toward respondent. Only one thing is really clear upon the record: that petitioner was a relentless worker. Although we discount a bit as hyperbole Hendrix's testimony that he worked 50 to 60 hours per week for petitioner, we do believe that by working evenings and weekends he was able to devote as much effort to *251 petitioner's affairs as any unrelated full-time president would have done. In addition, Hendrix performed duties for petitioner that were outside of the scope of the usual duties for a chief executive. Petitioner did not employ any clerks, secretaries, or bookkeepers in its business; Hendrix performed all of the clerical, secretarial, and accounting services that were necessary for the business. Hendrix was a factotum who did everything but answer the phones for petitioner's answering service; and on occasion he would even perform that job. We are convinced that the services that Hendrix performed for petitioner were unusual and not comparable to those described by respondent's expert witness. This witness testified that he received a salary of $18,000, which he considered reasonable, for managing an answering service business which was several times larger than petitioner's; however, the witness indicated that he had several executive supervisory personnel assisting him and that he did not perform any clerical, secretarial, or accounting duties for his employer. Similarly, the witness indicated that the industry-wide average rate of pay for chief executives, eight to ten percent *252 of gross receipts, probably did not encompass essentially oneman businesses like petitioner's. Hendrix testified that his salary was composed of two items, a regular salary of $12,000 and an extra payment of $6,000 to compensate him for unusual legal and accounting services performed in response to the tax investigations. [1] Upon the record, we hold that a reasonable compensation for petitioner's president for 1966 and 1967 would have been $13,000. We have discounted the $18,000 actually paid in each year to reflect the fact that petitioner was not profitable and that Hendrix was unable to document completely his performance of claimed extraordinary accounting services because of the tax investigation of petitioner during the years in issue. On the other hand, we do believe that Hendrix worked diligently to try to make petitioner profitable and that respondent substantially underestimated his efforts on behalf of petitioner. *253 Legal Fees In 1966 petitioner paid $6,000 with funds advanced by Hendrix to a local law firm to represent the interests of petitioner and Hendrix during a joint tax investigation of petitioner and Hendrix. Petitioner paid an additional $3,000 to the attorneys in 1967. The attorneys did not allocate their services between petitioner and Hendrix individually in preparing their bills; however, petitioner deducted as an expense for professional services $5,000 of the $6,000 paid in 1966 and all of the $3,000 paid in 1967 on its corporate income tax returns. It is clear from the exhibits submitted by the parties and from the testimony of respondent's witness, Ralph S. Chandler, (the purpose of whose testimony was to show that Hendrix did not deeply involve himself in the problems raised by the tax investigation) that the attorneys were working on behalf of both petitioner and Hendrix individually. Accordingly, respondent's disallowance of the entire deduction for professional services appears to us unwarranted and arbitrary. Upon examination of the record we hold that one-half of the services performed benefitted and were on behalf of petitioner. Because there is ample evidence in *254 the record upon which an allocation of the fees can be based, the present case is distinguishable from Arthur Jordan, 12 B.T.A. 423 (1928), and Aaron Michaels, 12 T.C. 17 (1949), which are cited by respondent. In these two cases there was no evidence in the records upon which an allocation could be based; therefore, the disallowance by respondent of the entire deduction for legal fees was of necessity sustained. In view of the substantial penalties to which petitioner might have been subject as a result of the investigation, we fail to understand respondent's further contention that all of the legal expenses were personal to Hendrix. In view of the foregoing, Decision will be entered under Rule 50. 36 Footnotes
1. Hendrix apparently estimated his own legal services to petitioner to be worth at least as much as those of the law firm which also charged $6,000. Our estimation of reasonable compensation for Hendrix does include an element to compensate Hendrix for unusual services performed in response to the tax investigations.↩